## CAMPAU ET AL *v.* CHENE ET AL.

In equity, the statute of limitations, or objections in analogy to it upon the ground of laches, may be taken advantage of by demurrer; and if there be any ground of exception within the statute to prevent the bar, or ground to rebut the presumption arising from length of time, it should be stated in the bill.

The rule extends to a bare equity against an equity, and is not limited to the enforcement of an equity against the legal estate.

Campau *et al. v.* Chene *et al.*

A conveyed a farm to B, his son-in-law, in consideration of $2,500. By the same instrument, B bound himself to pay the debts of A, especially a mortgage on the farm, and to account to A for the balance of the $2,500, after paying the debts; and B promised and obligated himself, besides the payment of the $2,500, to board, lodge and clothe A, in health and in sickness, during his natural life, &c., and A reserved to himself the right to live with B, and for the security of the payment of $2,500, and the fulfilling of the "clauses and conditions" above stated, B was not to give, alien, exchange or sell the farm without the permission of A, and the farm was to stand hypothecated till the payment in full of the $2,500, when A was "to release the present mortgage in a legal manner." *Held*,

1. That the deed was neither a deed of trust, nor upon condition; but that it was an absolute deed, incorporating within it a lien, in the nature of a mortgage, to the grantor for the $2,500 consideration money.

2. That the undertakings on the part of the vendee were personal covenants, and not conditions of the grant.

3. That if the covenant against alienation could be considered a condition, it was void.

CASE in chancery, reserved from Wayne Circuit Court. A bill was filed in that court on 22d November, 1847, by a part of the heirs at law of John Baptiste Campau, deceased, against other heirs of said Campau, and the devisee of Gabriel Chene, deceased, to set aside the following deed from Campau to Chene, dated 27th of May, A. D. 1800:

"Before the undersigned witnesses, was present Jean Baptiste Campau, of the township of Hamtramck, county of Wayne, in the territory of Michigan, who acknowledges to have sold, conveyed and made over, and by these presents do sell, convey and make over, from this day and for ever, to Gabriel Chene *alias* Cahousa, his son-in-law, the present accepting purchaser, for himself, his heirs and assigns, the farm or land on which the said Jean Baptiste Campau now lives, together with all the moveables, consisting in the articles mentioned and specified in the annexed inventory to these presents; also all the buildings thereon erected, seeds in the earth, &c. In a word, all that is now to be found on said farm, without excepting nor reserving any thing whatsoever, for and in consideration of the sum of one thousand pounds, New York currency, equal in value to two thousand five hundred dollars, legal currency of the United States: that the said Gabriel Chene *alias* Cahousa, promises and obligates himself to pay in the manner following, viz: The said Gabriel binds himself to pay the debts of the said Jean Bte. Campau, especially a mortgage that the Baby family holds against said

farm; and when the debts are paid, if any balance remain, the same shall be paid to said Jean Bte. Campau, or to his heirs, by giving to said Gabriel a good and lawful discharge therefor; it being well understood that said Gabriel is from this time answerable for these debts; and that, should he neglect to discharge them immediately, he will be bound to pay all damages and interest accruing therefrom.  The said Gabriel promises and obligates himself, besides the payment of the said one thousand pounds, to board, lodge and clothe the said Jean Baptiste Campau, in health and in sickness, in a reasonable and decent manner during his natural life, and after his decease to cause him to be buried decently, and have the usual prayers of the church said.

"The said Jean Bte. Campau reserves to himself the right to live with the said Gabriel Chene, his son-in-law, or with any other person he may please; and, in the latter case, the said Gabriel shall be bound to pay him a reasonable board, and continue to furnish him the necessary and proper clothing, as well as to have him attended to in case of sickness; as long as the said Jean Bte. Campau shall live with the said Gabriel, his son-in-law, he will, in no wise, be obliged to work, and if he does it, it will be of his own will and accord.

"The said Gabriel further promises and obligates himself to keep, at his house, Archange Campau, to board and clothe her decently, until she has reached her majority—that is, eighteen years complete.

"And for the security of the said payment of one thousand pounds, in the manner above mentioned, and for the fulfilling of the clauses and conditions here above expressed, the said Gabriel connot give, alienate, exchange or sell the said farm or land, nor all the moveable articles mentioned and specified in the said inventory, without the permission or assent of the said Jean Bte. Campau, and the whole shall remain and stand hypothecated till the payment in full of said one thousand pounds.

"The said farm or land is the same that said Jean Bte. Campau had from his father and mother, and forms a portion of the nine arpents of the first concession of the governor and intendant of New France and of Louisiana.  It consists in three arpents in front by eighty in depth, bounded on the west south-west by the farm of Jacque Campau, and on the east north-east by the farm of Simon Campau.

"It is well understood, stipulated and agreed between the parties,

that the said Gabriel Chene assumes only to pay the debts contracted to this day by the said Jean Bte. Campau, not exceeding the said sum of one thousand pounds, New York currency, and that he will not be bound to pay any debts that the said Jean Bte. Campau may contract after the date of these presents. That the said Gabriel Chene, in paying the above debts, shall take receipts from the different creditors, and that said Jean Bte. Campau will receive the said acquittances in payment of the above sum of one thousand pounds; and that when the said payment is made in full, the said Jean Bte. Campau, his heirs or assigns, shall be bound to appear at the office of the register of the county, to release the present mortgage in a legal manner.

" Done and passed at Detroit, &c."

The bill stated the farm in question descended to John Bte. Campau from his ancestors, and was by his ancestors rightfully obtained by grant from the constituted authorities of La Nouvelle France and Louisiana (so called), in times of great antiquity, and when this country appertained to and formed a part of said government: that being old and infirm, he resolved to sell and transfer the farm and his personal property to some member of his family who would, in consideration thereof, pay the debts he was owing, not exceeding one thousand pounds, New York currency (equal to $2,500), and maintain and support him during life: that on 27th May, 1800, the aforesaid deed was made and entered into between him and Gabriel Chene, his son-in-law, who took possession of the property, and who continued to occupy the farm until his death, when his son Gabriel Chene, one of the defendants, took possession of it as devisee under his father's will, and still continued to occupy it: that John Bte. Campau died on 18th April, A. D. 1819, and Gabriel Chene, senior, on the 1st February, 1831; and that the latter did not pay the debts of the former, or furnish him in his life-time suitable clothing, lodging and board, but wholly failed to comply with the terms and provisions of said deed of conveyance: that in 1821, after the death of John. Bte. Campau, Chene, senior, proceeded to prosecute his claim to the farm before the commissioners of the United States, acting under and by virtue of an act of Congress, entitled " An act to revive the powers of the commissioners for ascertaining and deciding on claims to land in the district of Detroit, and for settling the claims to lands at Green Bay and Prai-

rie du Chien, in the territory of Michigan," approved May 11, A. D. 1820, and that the same was confirmed to the heirs of said John Bte. Campau, to be held by them in fee, subject to all legal and equitable claims thereto of the said Gabriel Chene, senior: that the proceedings of the commissioners were afterwards confirmed by Congress, and that the commissioner of the General Land Office had decided not to issue a patent until the rights and equities of the complainants and defendants should be judicially settled. The bill prayed the deed to Chene, senior, might be canceled, the rights of the complainants be declared and defined, and for an account of rents and profits.

The defendants demurred for want of equity; and also because it appeared by the bill that Chene, senior, and those claiming title under him, had been in the exclusive and uninterrupted possession of the farm from the year 1800 down to the time of filing the bill.

*Fraser*, for the demurrer.

*Backus*, contra.

*By the court*, WING, J. The case made by the bill is based upon the supposition that the deed from Campau to Chene is a deed of trust, or a deed upon conditions, and in consequence of the failure of Chene to perform the conditions, it ceased to be operative and binding upon Campau. It is alleged, in the bill, that immediately after the execution of the deed, Chene entered into the possession of the farm, and he and his descendants have continued in possession ever since. It is not alleged, nor does it appear, that Campau or his heirs ever commenced any legal or equitable proceedings to take advantage of the alleged forfeiture, or that they have attempted to enter for conditions broken.

Campau died in 1819, and Chene died in 1831. It is, however, alleged that there was almost an entire failure on the part of Chene to comply with what are called conditions in the deed; and this is referred to a period immediately after its execution. And now, after the lapse of forty seven years, this bill is filed for the purpose of having the deed set aside, and to have the equities of the heirs of Campau and Chene settled.

The demurrer to the bill, as is claimed by complainant's counsel, admits all the facts well stated in the record. Lube's Equity, 286; Har.

Ch. R. 8; but the conclusions of law are not admitted.  1 Ves. Jur. 78.

One of the objections urged by defendants under the demurrer is, *lapse of time.*

It will be found, upon examination of the authorities, that the principles by which courts of equity have been governed in cases where lapse of time has been urged as a defence to a bill, were settled and clearly defined at an early period in the history of equity proceedings. Lord Camden, in declaring his judgment in the case of Smith *v.* Clay, 3 Brown's Ch. R. 699, in note, lays down the doctrine thus: " A court of equity, which is ever active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced a great length of time. Nothing can call forth this court into activity, but conscience, good faith, and reasonable diligence; where these are wanting, the court is *passive*, and does nothing." He further remarks, that " laches and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court.  But as the court has no legislative authority, it could not properly define the time of bar by a positive rule, to an hour, a minute or a year: it was governed by circumstances.  But, as often as parliament had limited the time of actions and remedies to a certain period, in legal proceedings, the court of chancery adopted that rule and applied it to similar cases in equity.  For where the legislature had fixed the time at law, it would have been preposterous for equity (which by its own proper authority always maintained a limitation,) to countenance laches beyond the period that law had been confined to by parliament; and therefore, in all cases where the legal right has been barred by parliament, the equitable right to the same thing has been concluded by the same bar."

In the case of Bond *v.* Hopkins, 1 Sch. and Lef. 429, Lord Redesdale maintains the same doctrine, and held, that if the equitable title be not sued upon within the time within which a legal title of the same nature ought to be sued upon, to prevent the bar created by the statute, the court, acting by analogy to the statute, will not relieve. The same judge, in Hovenden *v.* Lord Annesley, 2 Sch. and Lef. 632, again sustains the same doctrine in all its length and breadth.

In the case of Miller *v.* Mitchell, 1 Bailey's Ch. R. 437, which was a suit by a creditor against the pecuniary legatees of his debtor, to refund their legacies for payment of his demand, on the ground of the insolvency of the executor, it was held, the suit was barred by lapse of time, in analogy to the statute of limitations; and the court say, they " will not only apply the statute of limitations in cases of mere equitable titles and demands, but in cases of purely equitable cognizance would also give effect to lapse of time as a bar in analogy to the statute."

In 1 Hill Ch. R. 213, Prescott *v.* Hubbell *et al.*, the court say, lapse of time in equity, in analogy to the statute, is a bar to relief for fraud.   3 P. Will. 143.

In Beckford *v.* Wade, 17 Ves. 86, the court admit of no exceptions to do away with the operation of lapse of time, but such as are mentioned in the statute of limitations; and this is accomplished by their own rules, independent of the statute, which only furnishes a convenient measure for the length of time that ought to operate as a bar in equity of any demand.

This doctrine was again fully considered and maintained in the case of Cholmondeley *v.* Lord Clinton, 2 Jac. and Walker, 137, 150, on ap- peal to the House of Lords.   All the cases were reviewed, and Lords Redesdale and Eldon affirmed this doctrine.

In the case of Winchcomb *v.* Hall, 1 Ch. Ca. 39, 40, the court refu- sed, after twenty years, to relieve against a deed fraudulently obtained of the father of plaintiff.

In the case of Chalmers *v.* Bradley, 1 Jac. & Walker, 63, the Mas- ter of the Rolls says, calling for accounts is always much discouraged after the death of the accounting party, if he lived long enough to have accounted in his life-time.   In that case, the person seeking an ac- count had laid by nineteen years after she came of age, and prayed for accounts against representatives in the third degree.   In this last case the doctrine of presumptions in courts of chancery is fully considered. In the present case, Campau lived nineteen years after the alleged breach of condition, and the litigation is now between heirs in the second degree.

But courts of equity will refuse relief, where no statute bar exists, *on general principles*, where a party has slept on his rights, and they have so held where the statute would not constitute a bar.   2 Jac. & Walker

Campau *et al. v.* Chene *et al.*

138, 150; 1 McLean 164, 103; 2 *id.* 396; 10 Ohio R. 25, 26; 3 McLean 82; 2 Am. Ch. Dig. 108: 2 Story's Eq. 735-6-7; 2 Sch. & Lef. 637-8; 9 Peters 416; 4 Dessaus. 91; 2 Ves. Jur. 11; 8 Ohio R. 40, 159; 1 Howard 193, 161; 1 Story's R. 204; 2 Barbour's R. 595; 17 Wendell 405; 20 *id.* 443: Har. Ch. R. 285; Story's Eq. Pl. 389; 2 Sumner 212; 10 Wheaton 152.

But it is insisted, that stale demands not recognized in a court of chancery are where the complainant seeks to enforce an equity against the legal estate of a defendant, not where the complainant, having the basis of a legal title, seeks to have the equity of the defendant declared: that the rule is not applicable in the case of a bare equity against an equity. But no cases are cited which show that the rule has such limitation.

The claimants assume that they have the basis of a legal title in the confirmation of the board of commissioners of private land claims. On the face of their bill they assert that Campau the elder had a legal title, derived from the French government, which he conveyed to Chene. True, they say it was a deed of trust, or a deed upon condition. Still, the legal title would pass to Chene, if this was true, and thus have invested him with not only the basis of title, but the actual legal title. The act of congress which conferred upon the commissioners their powers, would not authorize them to divest this title and give it to another, but only to recognize and confirm it. Under the law and the treaty, they could not do otherwise, if claim was made and the title produced before them. But complainants' counsel assumed, in the argument of this cause, that Campau never had such legal title, and that all the right either party could have, was the right to claim under the act of congress a donation from the government, and that this right was a bare equity.

It may not be necessary in this place to discuss the nature of the titles by which the French settlers in this country held their lands. The several acts of congress certainly recognized a title to something connected with the land, as passing by deed, previous to a patent from the United States, in cases where no grant was shown from any government: for confirmations were made to individuals upon proof of cultivation and possession of others, the right to which passed by deed to claimant, and was perpetuated by him; and whoever derived that kind of title by deed from others which the government recognized as form-

ing the basis, or in part the basis of their grant, would have the basis of a legal title.

In this case, whether Chene traced his title from the French government through Campau, or had a valid claim to title under the law, founded upon the occupation of Campau and himself, he had the basis of title. The question, then, was, whether the deed from Campau was an absolute deed. The proceedings of the commissioners were referred to in the course of the argument, and upon examination of the decision of the majority of the board, it appears they felt doubts as to their authority to confirm the farm to Chene, because the claim was made by Chene in the name of Campau, though to his own use. They appear also to have doubted (at the least one of them did) what was the precise character of the deed from Campau to Chene, and they express their conviction that their board was not organized with a view to the determination of questions of the character presented: *they therefore* confirm the claim to " the heirs of Campau, subject to the just, legal and equitable claims of Chene."

It is true, the only claim ever made was made in the name of Campau, but by Chene, and so far as the farm was concerned, it was so claimed to Chene's use, and this probably arose from considerations not now known, for the claim embraced lands to which Chene never pretended to have a title. Had the commissioners understood the deed to be an unconditional deed, it is highly probable there would have been no difficulty in confirming the farm to Chene. Therefore, under the confirmation, the person having by it the basis of legal title is dependent upon the construction which may be put upon the deed.

But assuming that this is a case of a bare equity against an equity, when did the equities of the parties arise and acquire a definite character, if ever? If we assume what is substantially asserted in the bill, we say it arose immediately after the execution of the deed. But if we assume that it could not arise until there was a legal right upon which it was founded, then these equities arose so soon as the first act of congress was passed authorizing a confirmation of title to those who themselves, or by those through whom they claimed title, had continued to occupy and cultivate lands from 1796 to 1807: for upon proof of continued occupation and cultivation according to the statute, the legal right to a confirmation was perfect under the law—the commissioners

JANUARY TERM, 1850.                        409

Campau et al. v. Chene et al.

could not choose but confirm such claim. It was as perfect as it is now, and as it has been since the confirmation: for the legal title, strictly speaking, is still in the government. The confirmation is an advance in the stage towards a title, but it is still one step short of a title.

Then counting from 1809, thirty-eight years elapsed prior to the commencement of this suit, and from the confirmation in 1823, upwards of twenty-five years had elapsed. If there is any limitation in analogy to the statute of limitations of this state, this suit is barred, and the same result would follow upon the principles of a court of equity applicable to this case, independent of the statute. It is a stale claim: the grantor in the deed lived nineteen years after a breach in the supposed conditions of the deed is alleged to have occurred: and for aught that appears in the bill, there was not during that period any obstruction to the enforcement of his rights or equities as against Chene. In the mean time, and from 1800, Chene and his descendants have been in the quiet possession of the farm, and claimed and held it as their property in fee and have in no wise recognized any right of Campau or his heirs in the same—on the contrary, the elder Chene devised it in fee to his son.

All the reasons which could operate in any case to prevent a court entertaining a bill to recover a stale demand, exist in full force in this case. The testimony taken by the land commissioners, shows that the matters to be proved occurred upwards of forty-five years ago. And very many of the witnesses are dead, as well as the parties who could properly superintend the investigation of the truth of the matters alleged. The complainants and their ancestor have slept on their rights, whatever they may have been; have acquiesced a great length of time, and have shown no diligence.

We now turn to an examination of the statutes of limitations of this state, so far as they have a bearing upon this question.

By the statute of 1820 (which was the first), Laws of 1820, p. 245, sec. 6, all real and possessory actions are limited to twenty years. It is declared, that " no persons having right or title of entry into houses, lands, tenements, or hereditaments, shall hereafter thereinto enter, but within twenty years next after such right of entry shall accrue, or have accrued." The statute of the 5th of November, 1829, provides, that

"no writ of right or other real action, no action of ejectment, or other possessory action of *whatsoever name or nature*, shall hereafter be sued, prosecuted or maintained for the recovery of any lands, tenements or hereditaments, *if the cause of action has now accrued*, unless the same be brought within ten years after the passing of this act, any law, usage or custom to the contrary notwithstanding." Laws of 1833, p. 408, sec. 1. The laws of 1838 on this subject, are prospective, except so far as the former statutes are declared to be the governing rule as to past cases. The statutes of 1820 and 1829 furnish the rule governing all cases accruing under them. This is the construction which has been put upon the act of 1838, in the case of Lastley *v.* Cramer, 2 Doug. Mich. R. 307; and see the case of Joy *v.* Thompson, 1 Doug. Mich. R. 373.

The defendants have sought to take advantage of lapse of time by demurrer: and it seems now to be conceded as quite clear, that the statute of limitations or objections in analogy to it, upon the ground of laches, may be taken advantage of by way of demurrer. If the complainant has any ground of exception within the statute to prevent the bar, or ground to rebut the presumption arising from length of time, then the bill should state it, and it would not be demurrable. Hovenden *v.* Ld. Annesley, 2 Sch. & Lef. 637-8; Foster *v.* Hodgson, 19 Ves. 180; 12 Peters 686; Hoar *v.* Peck, 6 Simmons 51; 7 Paige 195; Story's Eq. Pl., secs. 503, n. 4, 484, 571; Har. Ch. R. 279.

If a complainant merely states a claim founded on such a distance of time as that the court upon the analogy it has adopted with respect to the statute of limitations will refuse to assist, he may then be considered as having stated himself out of court, and he may be told that if any peculiar circumstances existed in his case, which would have *entitled* him to relief, he *ought to have brought them forward upon the record.* See note to Bro. Ch. R. 529. In this case, no facts are stated which account for the delay, or which bring the case within any of the exceptions of the statute, or which rebut the presumption arising from length of time.

With a view to settle all the points fully presented by this case, we will now proceed to an examination of the deed, to ascertain, if possible, its true character. Is it a deed of trust, or a deed upon condition? No question is made as to the instrument being a deed. It has

every requisite as to parties, consideration, words of grant, &c., and it is executed with all the solemnities requisite to make it a good and valid deed. After stating the names of the grantor and grantee, we have the granting clause; then the description of the land and personal property granted; and next the consideration, which is stated to be " one thousand pounds New York currency," equal in value to two thousand five hundred dollars, legal currency of the United States; and the deed provides:

1. That the said Gabriel Chene, *alias* Cahousa, promises and obliges himself to pay in manner following, viz: Chene binds himself to pay the debts of Campau, and especially Baby's mortgage on said farm; and if there is any balance, it is to be paid to Campau, he giving a good and lawful discharge therefor.

2. It is then stated: it being well understood that said Gabriel is from this time answerable for these debts; and that, should he neglect to discharge them immediately, he will be bound to pay all damages and interest accruing therefrom.

3. The next provision is, that said Gabriel promises and obligates himself, besides the payment of the said one thousand pounds, to board, lodge and clothe the said Jean Bte. Campau during his life.

4. Then Campau reserves to himself the right to live with Chene or any other person he may please; in the latter case, Chene shall be bound to pay his board, clothe him, and have him attended when sick; and as long as Campau lives with Chene, he is not to be obliged to work, and if he works, it will be of his own will and accord.

5. Chene next promises and obligates himself to keep at his house Archange Campau, to board and clothe her decently, until she has reached her majority; that is, eighteen years complete.

6. " And for the security of the payment of the said one thousand pounds, in the manner above mentioned, and for the fulfilling of the clauses and conditions here above expressed," Chene is prohibited from alienating, exchanging, or selling the farm or personal property without Campau's consent, and the whole is to remain and stand hypothecated till the payment in full of said one thousand pounds.

7. There is a further statement of their understanding that Chene is only to pay the debts of Campau then due, not exceeding the said sum of one thousand pounds: in paying debts he is to take receipts, which

are to be received in payment of the one thousand pounds, and when all is paid, Campau or his heirs are bound to appear at the office of the register of the county, "and release the present mortgage in a legal manner."

It is difficult to perceive upon what clause the complainant can rely as furnishing a condition or evidence that it was intended the deed should depend upon a condition either subsequent or precedent. All and each of these different clauses can only be construed as personal covenants; there is an entire absence of any words creating a condition. By the first clause, there is an express covenant that the grantee will pay the $2,500 in a particular manner. The grantor takes this covenant or personal obligation in lieu of money in hand. Chene, by the second clause, assumes to be answerable for the debts of Campau, and if he fails to pay immediately, he assumes to be answerable for all damages and interest accruing therefrom; and this is taken in lieu of a condition, upon breach of which the grantor might re-enter. Why should Chene assume the debts from the time of receiving the deed, and agree to pay damages and interest if he did not pay? and why are they agreed to be his debts, if his title was to depend upon his first paying the debts of Campau, in the manner and to the extent provided? It is not provided, that in the event of his failing to pay, he shall forfeit his title, or that the grantor might re-enter.

The third provision (for the support of Campau) is not stated to be any part of the consideration of the deed. It is a simple engagement or covenant of Chene to support Campau, &c., besides the payment of the money. The undertaking may have grown out of the same transaction, but the deed does not make it a condition.

All these promises and covenants are made by Chene; they are not imposed as the terms and as the language of the grantor. To make them operate as a condition, they must not depend upon another sentence; *and the words must be those of the grantor, and compulsory to enforce the grantee to do some act.* 2 Bac. Abr. 280; 15 Eng. C. L. Rep. 227; 2 Jacobs' Law Dic. 2; 2 Coke's Rep. 70; Sheppard's Touchstone, 119.

In the fourth provision, Campau reserves to himself the right to live with Chene, &c. In this there is no condition. The reservation is only of the privilege to live with Chene. It is no restriction to the

estate: it is a covenant, a mere personal right.   This sentence contains the nearest approach to a condition or qualification that is to be found in the deed.   The manner he was to be at liberty to employ his time, shows the matter rested in covenant, and might be coerced in a court of law.   The same may be said of the succeeding provision, by which Chene covenants to support Archange.

But let us apply the rules furnished by the books, and ascertain if they are such that, when applied to the construction of this deed, they will lead to a different conclusion.   No precise technical words are necessary to make a condition.   It is, however, necessary that it should appear from the face of the deed, to have been the intention of .the grantor to create a condition, and whether the words amount to a condition, or a limitation, or a covenant, depends upon the construction of the contract.   4 Kent's Com. 132; 2 Caine's R. 352; Willes' R. 156.

The distinctions on this subject are extremely subtle and artificial, and the construction of a deed, as to its operation and effect, will after all depend less upon artificial rules than upon the application of good sense and sound equity to the object and spirit of the contract.   4 Kent's Com. 132.

The words usually employed in creating a condition, are, "upon condition;" and Lord Coke says this is the most appropriate expression, or the words may be "so that," "provided," "if it shall happen." Apt words of limitation are "while," "so long as," "until," "during," &c.   4 Kent's Com. 133, note a.

A condition, then, is a qualification, or restriction annexed to a conveyance of land, whereby it is provided, that in case a particular event does or does not happen, or in case the grantor or grantee does or omits to do, a particular act, an estate shall commence, be enlarged or defeated.   2 Cruise's Digt. 2.

In case of doubt, all intendments are made against the grantor, and a condition which destroys or defeats an estate or grant, is to be construed strictly against those for whose benefit it is intended.   4 Kent's Com. 125; 2 Bac. Abr. 286; 2 Cruise's Digt. 27; 29 Eng. C. L. Rep. 442; 1 Sumner 440; 17 Johnson's Rep. 66; 8 N. H. Rep. 477; 21 Eng. C. L. Rep. 398; 42 *id.* 693.   And if it be doubtful whether a clause in a deed be a covenant or a condition, the court will incline against the latter construction.   4 Kent's Com. 127.   To create a con-

dition in a deed, a clause of re-entry, or a provision that the estate shall cease and be void, is required.    3 Com. Digt. 87, 88.    Not so as to a lease, 4 Kent's Com. 123, *if the estate is declared to be void upon non performance, or if in such case the lessor may re-enter.*    8 Cowen 295; 1 Bac. Abr. 280, 281.

But words may amount to a condition when, without such construction, the party would have no remedy, but not when there are express covenants to which recourse may be had.    2 Bac. Abr. 287.    Paying and yielding rent held not a condition.    2 Bac. Abr. 287, 290; 3 Com. Digt. 88; 4 Cruise's Digt. 375; Sheppard's Touchstone, 118, 119; 9 Eng. C. L. Rep. 296; 27 *id.* 129.

Applying these rules to these provisions, and they seem to make it more certain that they do not separately or collectively create a condition, but that they are covenants.

But the sixth provision, in my opinion, goes far to settle the proper construction to be put upon this deed.    The very circumstance of setting forth the lien shows it was never intended to create a conditional estate, for if it was intended to be a conditional estate, the grantor would not have made such a provision; he would have provided a clause of re-entry; and it is to be remarked, that the lien has reference entirely to the consideration, and not to the support of Campau and his daughter.    All the covenants are the language of the grantee, except one; and even if the last covenant be considered as the language of both parties, it shows that a mortgage only was intended by both parties, and in case of payment, Campau was bound to give a full receipt, and to release the lien in the register's office.    This would not have been necessary, if payment and fulfilment was only required to perfect the deed.    If the covenant against alienation could be considered a condition, it would be, void.    For a condition annexed to a conveyance in fee or devise, that the purchaser or devisee should not alien, is unlawful and void.    4 Kent's Com. 126.

In the case of Lessee of Foster *v.* Dennison, 9 Ohio R. 121, the court was required to construe an instrument by which the parties acknowledged payment of the consideration, and obliging the grantor to forever quit claim land; sealed, acknowledged, recorded, and possession released to the grantor, and held for thirty-five years; and the court held it to be a conveyance; that this was the manifest intent of

the parties, and the law would endeavour so to interpret the proceedings of the parties as to work this effect.

The views we have expressed in regard to the covenants in the deed, are illustrated and fully supported by the case of Pownal *v.* Taylor, decided in the Virginia court of appeals, 10 Leigh's Rep. 179. The owner of a tract of land conveyed it to his nephew in fee, subject to the maintenance and support of the grantor and his sister. The deed contained a covenant by the grantee for such maintenance and support, and declared that the land was to be held therefor, into whose hands soever it might come. But the deed did not state that it was *upon condition* that such maintenance and support should be furnished, nor was there any clause providing for a re-entry by the grantor. Held, the provision for maintenance and support constituted merely a charge upon the estate, which might be enforced in equity—not a condition for breach of which the grantor could re-enter, as of his former legal estate. In that, as well as in this case, there was a provision for a third person, and it was held, that the third person (the sister) instantly acquired a beneficial interest, which she might have enforced by bill in equity. But if the provision was a condition then for the breach, the grantor might re-enter, defeat the estate, reinvest himself with his original title, and annihilate the vested interest which he had by his own solemn act conferred upon his sister. This cannot be, unless the grantor had expressly reserved the right to re-enter upon failure of the grantee to fulfil the purposes of the grant. These last remarks apply with full force to the provision for Archange in this deed. See 18 Pick. 248.

The mutual covenants in this case go only to a part of the consideration, and a breach of that part may be paid for in damages. In such case it has been held, they are to be regarded as independent. 7 John. R. 244; 1 Ohio 154; 10 Pick. 507; 3 Peters 346; 1 H. Black. 273; 5 Wendell 496;—particularly when they regard real estate, restrictions on which are odious in law. Sheppard's Touchstone 133.

We are therefore of the opinion upon the question of lapse of time, that complainants' bill cannot be sustained: and also, upon the question raised upon the deed, we are of the opinion that it is neither a deed of trust, nor a deed upon condition, but that it is an absolute deed, incorporating in it a lien, in the nature of a mortgage, to the grantor for the consideration money, &c.

Let it be so certified to the circuit court for Wayne county.

*Certified accordingly.*